**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Leyla Osman and Sayidali Mohamed,

Plaintiffs,

v.

Worldwide Flight Services, Inc.,

Defendant.

Case No. 25-cv-01154 (LMP/ECW)

**ORDER**

---

This matter is before the Court on Plaintiffs Leyla Osman and Sayidali Mohamed's Motion for Leave to Amend Complaint to Add Punitive Damage Claims (Dkt. 41) ("Motion to Amend"). For the reasons set forth below, the Motion to Amend is granted.

## I. BACKGROUND

Plaintiffs Leyla Osman ("Osman") and Sayidali Mohamed ("Mohamed") (collectively, "Plaintiffs") filed their Complaint in this matter on March 31, 2025. (Dkt. 1.) The Complaint alleges that Defendant Worldwide Flight Services, Inc. ("WFS" or "Defendant") repeatedly failed to accommodate Plaintiffs' religious needs; discriminated against them because of their sincere religious beliefs; subjected Plaintiffs to a hostile work environment because they are Muslim; and retaliated against Muslim employees who reported the ongoing discrimination and/or complained about religious discrimination, including Plaintiffs, who engaged in a December 13, 2021 protest and a

May 10, 2022 walkout. (*See generally id.*) The Complaint further alleges that WFS failed to pay wages owed to Plaintiffs. (*Id.* ¶¶ 157-65.)

In particular, Plaintiffs assert a count of "Religious Discrimination Title VII of the Civil Right Act of 1964 (42 U.S.C. § 2000e)" (*id.* ¶¶ 95-107); a count of "Religious Accommodation Failure to Accommodate (42 U.S.C. § 2000e-2(a))" (*id.* ¶¶ 108-121); and a count of "Retaliation in Violation of Title VII (42 U.S.C. § 2000e-3)" (*id.* ¶¶ 122-32). As part of these claims, Plaintiffs assert:

> Punitive damages are available against WFS for its malice and reckless indifference for Plaintiffs' rights and its intentional violations of the federal law, and are hereby claimed as a matter of federal law, Smith v. Wade, 461 U.S. 30 (1983), and, as such, are not subject to the pleading requirements set forth in Minn. Stat. § 549.20.

(*Id.* ¶¶ 106, 120, 131.) Plaintiffs also assert a count of "Religious Discrimination and Accommodation in Violation of the Minnesota Human Rights Act" ("MHRA"), in which they state that they "will move this Court in accordance with Minn. Stat. § 549.20 to apply to claims for punitive damages, as determined by a jury, under the MHRA." (*Id.* ¶¶ 133-43.) As to the wages claim, Plaintiffs assert a count of "Failure to Pay Wages in Violation of Minn. Stat. §§ 181, et seq. (the 'Minnesota Payment of Wage Act')." (*Id.* ¶¶ 157-65.)[1]

[1] Plaintiffs also asserted a Minnesota Whistleblower Act claim pursuant to Minn. Stat. § 181.932 (Dkt. 1 ¶¶ 144-56), but now seek to remove from the proposed amended complaint (*see* Dkt. 43 at 30-32). WFS does not oppose this amendment.

On April 29, 2025, WFS filed its Answer. (Dkt. 8.) WFS did not move to dismiss the Complaint, including as to the claims for punitive damages based on the federal claims. (*See id.*)

With their Motion to Amend (Dkt. 41), Plaintiffs filed a redlined copy of the operative Complaint, showing the differences between the operative Complaint and the proposed amended complaint. (Dkt. 43 (Ex. A) at 5-35.)[2] As such, for the purposes of this Motion, the Court will address the allegations in the redlined proposed amended complaint. The relevant allegations of the redlined proposed amended complaint are stated below.

Osman is a Muslim woman who was born in Somalia and Mohamed is a Muslim man who was born in Somalia. (*Id.* ¶¶ 18, 23.) Osman and Mohamed began working as warehouse agents in 2020 and 2021, respectively, for IAS Logistics DFW, LLC d/b/a Pinnacle Logistics (“Pinnacle”). (*Id.* ¶¶ 13-14.) Pinnacle was one of the leading providers of cargo handling services in the United States. (*Id.* ¶ 13.) In September 2021, WFS acquired Pinnacle and Plaintiffs’ employment contracts were assigned to WFS. (*Id.* ¶ 15.) WFS is a global company in the business of processing and transporting goods by air and ground transportation. (*Id.* ¶ 16.)

Osman’s job duties as a warehouse agent included packing boxes and shipping. (*Id.* ¶ 29.) Mohamed’s duties as a warehouse agent included loading and unloading metal boxes for placement in trucks and packaging boxes. (*Id.* ¶ 20.) Mohamed also became

[2] Unless otherwise stated, page number citations are to the pagination numbers assigned by CM/ECF.

certified as a forklift operator. (*Id.* ¶ 21.) Mohamed's duties as a forklift operator included loading and unloading trucks and inspecting the forklift prior to driving. (*Id.*)

Part of Osman and Mohamed's Muslim faith is to pray five times a day at a precise time. (*Id.* ¶ 31.) Praying on time is very important to Plaintiffs because it is part of their belief that missing a prayer is a sin against God. (*Id.* ¶ 32.) In addition, Wudu is a core belief and practice of Islam for Plaintiffs. (*Id.* ¶ 33.) Wudu is the procedure of cleansing and purifying one's hands, mouth, nose, face, hair, ears, ankles, and feet before beginning prayers and presenting oneself to God. (*Id.*) Ramadan is the Muslim holy month, and is focused on spiritual growth, praying, community, and reflection. (*Id.* at 34.) Ramadan ends on Eid—one of the major holidays in the Muslim faith. (*Id.* ¶ 35.) For Plaintiffs, Eid is their most important faith holiday. (*Id.* ¶ 36.)

In observance of their faith, Osman and Mohamed prayed at work, but WFS' management continually harassed them during their prayers. (*Id.* ¶ 37.) The following WFS managers were hostile toward Plaintiffs and other Muslim employees: Senior Manager on Duty April Joiner ("Senior Manager Joiner"), General Manager Jason Watson ("General Manager Watson"), Operations Manager Jeremy Van Bogart ("Operations Manager Van Bogart"), Supervisor David Hernandez ("Supervisor Hernandez"), Manager on Duty Kalla Awatt ("Manager Awatt"), Executive Vice-President Mike Simpson, Regional Human Resource Manager Jennifer West ("Regional HR Manager West"), and temporary General Manager Ben Tauataire (who normally worked in California). (*Id.* ¶¶ 38, 74.)

According to Plaintiffs, Supervisor Hernandez frequently made statements such as, "fuck, I hate this bullshit with their praying" to Plaintiffs and other Muslim employees. (*Id.* ¶ 39.) Supervisor Hernandez followed Osman and other Muslim employees around when they were praying and said, "[F]uck you, go home. You're not listening to me." (*Id.* ¶ 40.) On several occasions, Osman and Mohamed heard Supervisor Hernandez say "they fucking pray too much" and call a group of Muslims "ten fucking people." (*Id.* ¶ 41.)

When Osman and other female Somali Muslim employees performed Wudu before saying their prayers, Senior Manager Joiner disparaged and harassed them by describing their cleansing as "taking a shower" in the bathroom. (*Id.* ¶ 42.) She further declared that the bathroom "stunk" after Somali Muslim women used it. (*Id.*) Senior Manager Joiner also accused female Muslim employees, including Osman, of urinating on the bathroom floor after Wudu. (*Id.* ¶ 43.) She further alleged that Osman and other Somali Muslim employees' homes "must look like shit because this warehouse is filthy" after taking a photo of them while they were eating. (*Id.* ¶ 44.)

On some occasions, Supervisor Hernandez stopped Muslim workers on their way to pray, telling them there was work to be done even though the prayer would not be disruptive to their work and would not take more than ten minutes. (*Id.* ¶ 45.)

Another WFS supervisor, Ali Abdakadr ("Supervisor Abdakadr"), who referred to himself as a General Manager, would hover and spy on Plaintiffs in their prayer area to see if they were really praying, which was intimidating and disruptive to the employees attempting to pray. (*Id.* ¶ 46.)

Osman and Mohamed asked to take the day of Eid off, and provided sufficient prior written notice of their request. (*Id.* ¶ 47.) A week before Eid, they were told they could take the day off, but then the day before, some of them, like Osman, were informed that they were denied the day off. (*Id.*) Mohamed and Osman took Eid off in observance of their religion, but WFS wrote them up, even though giving them Eid off would not have caused undue hardship to the conduct of WFS' business, as WFS had over 100 warehouse employees. (*Id.* ¶¶ 48-49.)

Another Somali Muslim employee, Mustafa Karama ("Karama"), informed a Pinnacle and WFS' General Manager and Operations Manager (not identified by name) on October 19, 2021 that Senior Manager Joiner used abusive language, used intimidation tactics, and treated employees poorly and unprofessionally. (*Id.* ¶ 50.) Karama specifically identified that Senior Manager Joiner's conduct was directed to a specific targeted group of employees, which the recipients of the complaint understood to be other Somali Muslim employees, and urged corporate managers or directors to come to visit the facility to see what was happening. (*Id.*)

At all times relevant to the claims at issue, WFS and its predecessor had employment policies in effect that prohibited unlawful discrimination against employees on the basis of race, sex, color, religion, and national origin, among other things, which included policies related to unlawful harassment based on any of these protected classes and retaliation against employees who reported conduct prohibited by company policy or law. (*Id.* ¶¶ 51-53.) At all relevant times, WFS and its predecessor knew and understood that federal, state, and local laws and regulations governed company conduct and

prohibited WFS from discriminating against Plaintiffs due to their race, sex, color, religion, and national origin. (*Id.* ¶ 54.) WFS also had a "Supervisor Manual" that purported to prohibit the aforementioned discriminating and harassing conduct, but it was never provided to any supervisor at the Eagan warehouse where Plaintiffs worked. (*Id.* ¶ 55.)

All the above conduct by the various WFS supervisors and management was intentional, in violation of WFS' policies, in violation of law, and done with deliberate disregard for Plaintiffs' rights. (*Id.* ¶ 56.) Despite the fact that General Manager Watson and Operations Manager Van Bogart knew Supervisor Hernandez's conduct and Senior Manager Joiner's conduct was intentional and recklessly disregarded Plaintiffs' rights, they did not take corrective action or steps to stop the harassing conduct, they did not document the complaints, and they did not notify Human Resources of the complaints. (*Id.* ¶ 57.) According to Operations Manager Van Bogart's testimony in this case, he should have taken the complaints seriously and managed these issues differently. (*Id.* ¶ 58.)

On December 13, 2021, Plaintiffs heard Supervisor Hernandez yell from across the warehouse, "this is fucking bullshit," referring to Muslims praying that day. (*Id.* ¶¶ 60-61.) Plaintiffs were offended and outraged by this insult and reported Supervisor Hernandez's actions to Operations Manager Van Bogart, but the situation did not improve. (*Id.* ¶¶ 62-63.) Soon after, Supervisor Hernandez went to speak to General Manager Watson and Operations Manager Van Bogart. (*Id.* ¶ 64.) The three of them, in plain sight, began mocking the Muslim employees, pointing at them and laughing. (*Id.*)

All aforementioned conduct by the various WFS supervisors and management was intentional, in violation of WFS' policies, in violation of law, and done with deliberate disregard for Plaintiffs' rights. (*Id.* ¶ 66.)

On December 13, 2021, based on all of this conduct, several Muslim employees, including Plaintiffs, walked out and protested in front of the WFS warehouse (the "December 13 protest"). (*Id.* ¶ 67.) The Muslim employees demanded respect and accountability for the discrimination they suffered and an end to religious and racial discrimination at WFS. (*Id.* ¶ 68.) Upset at the protesters, General Manager Watson stated that WFS needed to stop hiring Muslims. (*Id.* ¶ 69.) Management spoke to the protestors and guaranteed that they could come back to work, they would experience no negative consequences, WFS would investigate the religious discrimination, and the situation would improve. (*Id.* ¶¶ 70-71.) However, after the employees returned, management retaliated, sabotaged them, made them perform work that was outside their job duties, and wrote them up for no apparent reason. (*Id.* ¶ 72.) The above conduct by the various WFS supervisors and management was intentional, in violation of WFS' policies, in violation of law, and done with deliberate disregard for Plaintiffs' rights. (*Id.* ¶ 73.)

After the December 13 protest, WFS directed Regional HR Manager West to conduct an investigation related to the complaints raised by Plaintiffs and other Muslim and Somali employees in the Eagan warehouse. (*Id.* ¶ 74.) On December 13, 2021, before Regional HR Manager West could begin her investigation regarding Supervisor Hernandez's alleged conduct, the company's Corporate Director, Joshua Finau, and

General Manager Watson had termination notices prepared for the twenty-one Muslim employees who walked out during the December 13 protest, but not for Supervisor Hernandez. (*Id.* ¶ 75.)

On or about December 28, 2021, Regional HR Manager West concluded her investigation and recommended that the entire leadership team at the Eagan warehouse, with the exception of Supervisor Amanda Schwartz ("Supervisor Schwartz"), be terminated immediately because management was acting in a biased and discriminatory way toward Somali and Muslim employees at the Eagan warehouse and treating them unfairly. (*Id.* ¶ 76.) Regional HR Manager West testified during this litigation that she "had never seen a facility ran like this." (*Id.* ¶ 77.) However, the only employee WFS terminated after the investigation concluded was Supervisor Hernandez. (*Id.* ¶ 78.) WFS terminated none of the other supervisors or managers. (*Id.*)

Even after the December 13 protest, Operations Manager Van Bogart and General Manager Watson knew that Plaintiffs' and other Muslim employees' concerns had not been adequately addressed or corrected, WFS' main customer had expressed concern to them about the staff, and WFS was "sitting on a ticking time bomb, another protest or legal action." (*Id.* ¶ 79.) However, instead of addressing the intentional conduct that deliberately disregarded Plaintiffs' rights and humiliated them and other employees in the warehouse, WFS management deliberately retaliated against Plaintiffs and the other participants in the December 13 protest. (*Id.* ¶ 80.) The retaliation included WFS requiring Osman to perform duties outside her regular job duties, writing her up without adequate reason, and taking away her overtime hours. (*Id.* ¶ 81.) For Mohamed, the

retaliation included punishment for a minor forklift accident that caused no injury. (*Id.* ¶ 82.) But when another employee hit Mohamed with a forklift and caused him injury, that employee was not disciplined. (*Id.*) In addition, WFS denied Mohamed a promotion and instead promoted someone less experienced and less qualified than him. (*Id.* ¶ 83.) Other actions evidencing bias and retaliation against Plaintiffs and other Muslim employees who were seeking religious accommodations included: General Manager Watson telling Supervisor Schwartz that WFS should not hire any more Muslims; WFS voicing concern regarding female Muslim employees' attire as somehow restricting their ability to perform their jobs; WFS refusing to provide Plaintiffs and other Somali and Muslim employees copies of their personnel files; and WFS managers requiring other Somali and Muslim employees (especially women) to work unassisted when unloading their bins. (*Id.* ¶¶ 84-87.) In addition, in April 2022, WFS management began requiring Plaintiffs and other Muslim employees to perform a "made up" task of Foreign Object Debris Walks ("FOD walks"), which were typically assigned to WFS employees (ramp agents) who worked at the airport (not warehouse agents), and which constituted cleaning the parking lot. (*Id.* ¶¶ 88-89.) Operations Manager Van Bogart, General Manager Watson, and Supervisor Schwartz all testified that FOD walks were required for ramp agents at the airport only. (*Id.* ¶ 90.) WFS "fabricated" this as a new task for those who had participated in the December 13 protest and wrote them up when they refused, even though non-Muslim employees who refused to clean the parking lot when asked were not sanctioned. (*Id.* ¶¶ 91-94.) WFS also retaliated against Plaintiffs and the other Muslim employees who participated in the December 13 protest by asking them to perform

janitorial duties such as taking out garbage and cleaning bathrooms, sanctioning them when they refused, yet not writing up non-Muslim employees who refused to perform janitorial duties. (*Id.* ¶¶ 95-97.) Plaintiffs and the other Muslim employees who participated in the December 13 protest were retaliated against by not being allowed to request to work overtime, as they had been able to prior to the protest. (*Id.* ¶ 98.) Plaintiffs and other Muslim employees were also denied promotions even though they complied with WFS' qualification and time requirements, and WFS instead promoted less experienced and less qualified employees. (*Id.* ¶ 99.) All the above conduct by the various WFS supervisors and management, other than Regional HR Manager West and Supervisor Schwartz, was intentional, in violation of WFS' policies, in violation of law, and done with deliberate disregard for Plaintiffs' rights. (*Id.* ¶ 102.)

On May 10, 2022, after a company meeting, Manager Awatt falsely accused Mohamed of being late to the meeting, and then she and Operations Manager Van Bogart sent Mohamed home. (*Id.* ¶¶ 105-06.) Based on this and worsening behavior of WFS management, Plaintiffs and twelve other Muslim employees walked out on May 10, 2022 ("May 10 walkout"). (*Id.* ¶¶ 103-04.) The next day, on May 11, 2022, when Plaintiffs and the other Muslim employees arrived at work, they were barred from entry by Manager Awatt and Supervisor Abdakadr. (*Id.* ¶ 108.) They told those employees, "[W]e will not let you guys in today. You are being held out of service, and HR personnel will reach out to you guys" pending investigation of the May 10 walkout. (*Id.*) WFS terminated the employment of Plaintiffs and the other Muslim employees who participated in the May 10 walkout. (*Id.* ¶¶ 109-10, 112, 115.)

However, Plaintiffs were not told that they were fired when they were barred from entering the warehouse on May 11, 2022. (*Id.* ¶ 109.) Instead, they were simply not allowed to return to work. (*Id.*) Mohamed did not receive notice of his termination until July 25, 2022. (*Id.* ¶ 112.) Despite WFS prohibiting Mohamed from working, WFS falsely claimed that Mohamed was terminated because he had abandoned his job. (*Id.* ¶ 111.) Mohamed was in fact terminated for engaging in protected conduct. (*Id.* ¶ 113.)

Osman was terminated without notice on May 11, 2022, allegedly because of insubordination, but in fact because she engaged in protected conduct. (*Id.* ¶¶ 115-16.) To prevent Osman from collecting unemployment benefits to which she was entitled, WFS intentionally misrepresented that Osman was still employed by WFS. (*Id.* ¶ 118.) WFS has improperly withheld payment for accrued vacation time from both Mohamed and Osman. (*Id.* ¶¶ 114, 117.)

All the above conduct by the various WFS supervisors and management was intentional, in violation of WFS' policies, in violation of law, and done with deliberate and intentional disregard for Plaintiffs' rights. (*Id.* ¶¶ 120-21; *see also id.* ¶ 122 (identifying specific conduct).)

With respect to their allegations of religious discrimination, reprisal, and failure to accommodate in violation of the MHRA, Plaintiffs allege that WFS intentionally discriminated against Plaintiffs and other Muslim employees based on their religion, race, color, and national origin by engaging in unfair employment practices such as disparate treatment, failure to accommodate religious beliefs and practices, and unlawful termination of Plaintiffs and other Muslim employees. (*Id.* ¶ 168.) Further, after

Plaintiffs and other Muslim employees complained and protested regarding WFS' illegal and discriminatory conduct, WFS intentionally discriminated against and punished them by fabricating a version of FOD walks for Plaintiffs and other Muslim employees, but not for all employees; requiring Plaintiffs and other Muslim employees, but not other employees, to perform janitorial duties; and writing up Plaintiffs for not performing FOD walks or janitorial duties, but not other non-Muslim employees who refused to do the same. (*Id.* ¶ 169.) These acts were deliberate acts of reprisal directed at Plaintiffs because they had protested and complained of the unfair and discriminatory conduct of WFS. (*Id.*) Plaintiffs were subjected to a hostile work environment when WFS managers used offensive language, attitudes, and actions of repulsion and antipathy against Plaintiffs and other Muslim employees. (*Id.* ¶ 170.) Additionally, WFS retaliated against Plaintiffs by terminating their employment based on their involvement in protected conduct. (*Id.* ¶ 171.) All the above acts were done with malice or reckless indifference to the protected rights of Plaintiffs and other aggrieved Muslim employees and despite WFS being aware of the high probability that its conduct would cause injury to Plaintiffs. (*Id.* ¶¶ 172-73, 176-77.)

## II. LEGAL STANDARD

Minnesota law prohibits a party from pleading a claim for punitive damages at the commencement of a lawsuit and provides a specific mechanism for amending the complaint to include a claim for punitive damages. *See* Minn. Stat. § 549.191. WFS argues that because the proposed amendments seek punitive damages based on Minnesota state law causes of action, the substantive requirements for punitive damages

contained in Minnesota Statutes section 549.20 apply and require Plaintiffs to show by clear and convincing evidence that WFS acted with deliberate disregard for the rights or safety of others. (Dkt. 46 at 1.) In diversity actions, "[c]ourts in the District of Minnesota have historically applied the state statute, Minn. Stat. § 549.191, rather than Rule 15, to motions to amend to add a claim for punitive damages." *Dolphin Kickboxing Co. v. Franchoice, Inc.*, 335 F.R.D. 393, 397 (D. Minn. 2020). However, as explained in *Dolphin Kickboxing*, "courts have recently taken another look at the practice . . . in view of the 2010 United States Supreme Court's decision in *Shady Grove Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393 (2010)." *Id.* at 397-98 (discussing caselaw beginning with *In re Bair Hugger Forced Air Warming Devices Products Liability Litigation*, MDL No. 15-2666 (JNE/FLN), 2017 WL 5187832 (D. Minn. July 27, 2017)). In *Dolphin Kickboxing*, this Court undertook an analysis of whether Minnesota Statutes section 549.191 or Federal Rule of Civil Procedure 15 should apply and concluded that Rule 15 should apply. *Id.* at 397-401. For the sake of brevity, the Court adopts that analysis and conclusion here, and notes that recent U.S. Supreme Court jurisprudence supports that decision. *See id.*; *see also Berk v. Choy*, 607 U.S. 187, 192 (2026) ("The Rules of Decision Act directs federal courts to apply state substantive law, leaving federal law to cover the rest.").

WFS relies on the order of another Magistrate Judge in this District applying Minnesota Statutes sections 549.191 and 549.20 instead of Rule 15. (Dkt. 46 at 14 (citing *Josie v. City of Princeton*, No. 24-cv-3449 (LMP/LIB), Docket No. 44 at 6-7 (D. Minn. Oct. 1, 2025), *overruled by*, 2026 WL 2874668 (D. Minn. Sept. 24, 2026)).) In

that order, the court stated, "When a party requests to amend their complaint to add a claim for punitive damages in this Court and the underlying claim is based on Minnesota state law, Minnesota Statutes § 549.191 and § 549.20 control; Federal Rule of Civil Procedure 15 has no place in the analysis." *Josie*, 24-cv-03449, Docket No. 44 at 7. However, United States District Judge Laura M. Provinzino sustained the plaintiff's objections to that order, *see Josie*, 2026 WL 2874668, at *5, and that order preceded the Supreme Court's decision in *Berk*, 607 U.S. 187.

For all these reasons, the Court continues to follow the majority of decisions in this District that "now apply Rule 15(a)(2) rather than section 549.191 in deciding whether to allow leave to amend a pleading to seek punitive damages for a Minnesota state law claim." *Perez v. Axis Residential, LLC*, No. 24-cv-4310 (MJD/JFD), 2025 WL 1088165, at *3 (D. Minn. Apr. 11, 2025) (collecting cases); *see also Simha v. Mayo Clinic*, No. 24-cv-1097 (DTS), 2025 WL 4101103, at *3 (D. Minn. Mar. 26, 2025) ("Section 549.191 governs pleading a claim for punitive damages: § 549.191 prohibits a party from pleading a claim for punitive damages at the commencement of a lawsuit and sets requirements for a party to amend the complaint to add a claim for punitive damages. Minn. Stat. § 549.191. By contrast, § 549.20 sets forth the legal standard for a party to recover punitive damages. Minn. Stat. § 549.20, subdiv. 1. Because § 549.191 is procedural, not substantive, Plaintiff could have included a claim for punitive damages in her initial Complaint. She did not. Now that Plaintiff moves to amend, her motion is governed by Federal Rule of Civil Procedure 15, not § 549.191."); *Hormozi v. Neist Media LLC*, Civ. No. 24-3241 (DWF/DTS), 2024 WL 4772462, at *8 (D. Minn. Nov. 13,

2024) (concluding that "Rules 8, 9, and 15 are valid under the Rules Enabling Act," so "the Court must follow the federal rules instead of" Minnesota Statutes section 549.191 and therefore permitting the plaintiff "to plead punitive damages in his original complaint" rather than dismissing them under section 549.191); *Evans v. Bus. Dev. Sales, Inc.*, No. 21-cv-01046 (SRN/HB), 2022 WL 670097, at *4 (D. Minn. Mar. 7, 2022) (concluding that Rule 15 rather than Minnesota Statutes section 549.191 provides the applicable "procedural framework for motions to amend to add a claim for punitive damages arising out of a state law cause of action"); *Speed RMG Partners, LLC v. Arctic Cat Sales Inc.*, No. 20-CV-609 (NEB/LIB), 2021 WL 7286933, at *3-6 (D. Minn. Aug. 6, 2021) (overruling order and concluding that Rule 15, not section 549.191, applied to a motion to amend to add punitive damages in a diversity case); *Shank v. Carleton Coll.*, No. 16-cv-1154 (PJS/HB), 2018 WL 4961472, at *4 (D. Minn. Oct. 15, 2018) (concluding Rule 15, not section 549.191, applied to motion to add punitive damage claims in diversity case); *Bair Hugger*, 2017 WL 5187832, at *4 (same).

Moreover, "[t]he specific punitive damages provision in the MHRA [Minnesota Statutes section 363A.29, subdivision 4] displaces the requirements of Minn. Stat. § 549.191." *Zuniga Escamilla v. SMS Holdings Corp.*, Civ. No. 09-2120 (ADM/JSM), 2011 WL 13318238, at *13 (D. Minn. July 29, 2011), *aff'd*, 2011 WL 13318237 (D. Minn. Dec. 14, 2011). "[H]owever, if the party moves to add punitive damages after the Complaint, Rule 15(a) applies." *Id.* "In determining whether a claim for punitive damages under the MHRA is futile for the purposes of Rule 15(a), the Court must ascertain whether" Plaintiffs have adequately pled that WFS "deliberately disregarded

[their] rights or safety under the mandates of Minn. Stat. § 549.20." *Id.* at *14; *see also Klyuch v. Freightmasters, Inc.*, Civ. No. 03-6135 (PAM/RLE), 2005 WL 318786, at *1 (D. Minn. Feb. 09, 2005) ("Under the Minnesota Human Rights Act ('MHRA'), punitive damages requires 'clear and convincing evidence that the acts of the defendants show deliberate disregard for the rights or safety of others.'" (quoting Minn. Stat. § 549.20)); *Ray v. Miller Meester Advert., Inc.*, 664 N.W.2d 355, 371 (Minn. Ct. App. 2003) ("Under the MHRA, punitive damages . . . are awarded under section 549.20." (citation modified)).

Rule 15 sets the general standard for amending pleadings in Federal court and provides that "[t]he court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). The determination as to whether to grant leave to amend is entrusted to the sound discretion of the trial court. *See, e.g.*, *Niagara of Wisc. Paper Corp. v. Paper Indus. Union-Mgmt. Pension Fund*, 800 F.2d 742, 749 (8th Cir. 1986). The Eighth Circuit has held that amendment of a pleading "should be allowed liberally to ensure that a case is decided on its merits, [but] there is no absolute right to amend." *Ferguson v. Cape Girardeau Cnty.*, 88 F.3d 647, 650-51 (8th Cir. 1996).

Denial of leave to amend may be justified by "undue delay, bad faith on the part of the moving party, futility of the amendment or unfair prejudice to the opposing party." *Sanders v. Clemco Indus.*, 823 F.2d 214, 216 (8th Cir. 1987) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)); *see also Hillesheim v. Myron's Cards & Gifts, Inc.*, 897 F.3d 953, 955 (8th Cir. 2018) ("A district court's denial of leave to amend a complaint may be justified if the amendment would be futile." (citation modified)). "Denial of a motion for

leave to amend on the basis of futility means the district court has reached the legal conclusion that the amended complaint could not withstand a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure," making the relevant question "whether the proposed amended complaint states a cause of action under the *Twombly* pleading standard." *Zutz v. Nelson*, 601 F.3d 842, 850-51 (8th Cir. 2010) (citation modified); *see also Moratzka v. Morris (In re Senior Cottages of Am., LLC)*, 482 F.3d 997, 1001 (8th Cir. 2007) ("[W]hen a court denies leave to amend on the ground of futility, it means that the court reached a legal conclusion that the amended complaint could not withstand a Rule 12 motion.").

On a motion to dismiss filed pursuant to Rule 12(b)(6), the Court must take the well-pleaded allegations of a claim as true and construe the pleading, "and all reasonable inferences arising therefrom, most favorably to the pleader." *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986). To survive a motion to dismiss, a claim "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

Because WFS argues that amendment of the complaint is futile (Dkt. 46 at 7), the Court must "determine whether [the proposed amended complaint] states a plausible claim for punitive damages in light of *substantive* Minnesota law." *Shank*, 2018 WL

4961472, at *4 (D. Minn. Oct. 15, 2018), *aff'd*, 329 F.R.D. 610 (D. Minn. 2019). As relevant here, Minnesota law provides the following legal basis for punitive damages:

> **Subdivision 1. Standard.** (a) Punitive damages shall be allowed in civil actions only upon clear and convincing evidence that the acts of the defendant show deliberate disregard for the rights or safety of others.
>
> (b) A defendant has acted with deliberate disregard for the rights or safety of others if the defendant has knowledge of facts or intentionally disregards facts that create a high probability of injury to the rights or safety of others and:
>
> (1) deliberately proceeds to act in conscious or intentional disregard of the high degree of probability of injury to the rights or safety of others; or
>
> (2) deliberately proceeds to act with indifference to the high probability of injury to the rights or safety of others.
>
> **Subd. 2. Master and principal.** Punitive damages can properly be awarded against a master or principal because of an act done by an agent only if:
>
> (1) the principal authorized the doing and the manner of the act;
>
> (2) the agent was unfit and the principal deliberately disregarded a high probability that the agent was unfit;
>
> (3) the agent was employed in a managerial capacity with authority to establish policy and make planning level decisions for the principal and was acting in the scope of that employment; or
>
> (4) the principal or a managerial agent of the principal, described in clause (3), ratified or approved the act while knowing of its character and probable consequences.

Minn. Stat. § 549.20, subs. 1-2.[3]

---

[3] Quoting *Doe YZ v. Shattuck-St. Mary's Sch.*, 214 F. Supp. 3d 763, 793 (D. Minn. 2016), WFS asserts "Minn. Stat. § 549.20, subd. 2(c) provides that punitive damages can only be awarded against a principal for acts done by an agent if the agent was employed in a managerial capacity with authority to establish policy and make planning level

Under these criteria, "[a] defendant operates with 'deliberate disregard' by acting with intent or indifference to threaten the rights or safety of others." *Gamma-10 Plastics, Inc. v. Am. President Lines, Ltd.*, 32 F.3d 1244, 1255 (8th Cir. 1994) (quoting Minn. Stat. § 549.20, subd. 1(a)). As such, "the mere existence of negligence or of gross negligence does not rise to the level of willful indifference so as to warrant a claim for punitive damages."[4] *Ulrich v. City of Crosby*, 848 F. Supp. 861, 868 (D. Minn. 1994); *see also Shank*, 2018 WL 4961472, at *7 (same); *Berczyk v. Emerson Tool Co.*, 291 F. Supp. 2d 1004, 1008 (D. Minn. 2003) ("A mere showing of negligence is not sufficient to sustain a claim of punitive damages." (citation modified)). Moreover, plaintiffs must allege that defendants were aware of a high probability that their conduct would cause injury to plaintiffs. *See In re McNeilus Mfg. Explosion Coordinated Litig.*, No. 17-cv-5237-PJS-KMM, 2019 WL 2387110, at *4 (D. Minn. June 6, 2019). Put another way, a court looks to whether the allegations in a proposed amended complaint plausibly allege a defendant knew of facts, or intentionally disregarded facts, that created a high probability that the defendant's actions would harm the rights or safety of a plaintiff.

decisions for the principal and was acting in the scope of that employment." (Dkt. 46 at 8 (citation modified).) First, WFS has misquoted *Doe YZ*, as that case referred to subdivision "2(3)," not "2(c)." *See* 214 F. Supp. 3d at 792-93. Second, this argument is unpersuasive because *Doe YZ* did not address paragraphs (1), (3), and (4) of subdivision 2, which describe other circumstances under which punitive damages can properly be awarded against a master or principal for acts of an agent.

[4] "Minnesota law defines gross negligence as 'without even scant care but not with such reckless disregard of probable consequences as is equivalent to a willful and intentional wrong.'" *Greer v. Walsh Constr. Co.*, Civ. No. 15-465 (PAM/JSM), 2016 WL 6892109, at *8 (D. Minn. Feb. 23, 2016) (quoting *State v. Chambers*, 589 N.W.2d 466, 478 (Minn. 1999)).

## III. ANALYSIS

As set forth above, Count IV of the proposed amended complaint alleges religious discrimination, reprisal, and failure to accommodate in violation of the MHRA. (Dkt. 43 (Ex. A) ¶¶ 166-179.) WFS asserts that the Motion is futile as the well-pleaded facts do not plausibly support an inference that WFS showed deliberate disregard for Plaintiffs' rights. (Dkt. 46 at 12.)

Here, Plaintiffs allege that Supervisor Hernandez frequently harassed them and other Muslim employees based on their religion. (Dkt. 43 (Ex. A) ¶¶ 39-41, 45, 60-61, 64.) But Supervisor Hernandez was not the only employee who allegedly made such derogatory comments to Muslim WFS employees. When Osman and other female Somali Muslim employees performed Wudu before saying their prayers, Senior Manager Joiner disparaged and harassed them by describing their cleansing as "taking a shower" in the bathroom and declared that the bathroom "stunk" after Somali Muslim women used it. (*Id.* ¶ 42.) Senior Manager Joiner went so far as to accuse female Muslim employees, including Osman, of urinating on the bathroom floor after Wudu. (*Id.* ¶ 43.) Further, Supervisor Abdakadr would hover and spy on Plaintiffs in their prayer area to see if they were really praying, which was intimidating and disruptive to the employees attempting to pray. (*Id.* ¶ 46.)

On October 19, 2021, a Somali Muslim employee informed Pinnacle and WFS' General Manager and Operations Manager that Senior Manager Joiner used abusive language, used intimidation tactics, and treated employees poorly and unprofessionally, yet no investigation occurred until December 2021, while Supervisor Hernandez, General

Manager Watson, and Operations Manager Van Bogart's harassment of Muslim employees continued. (*Id.* ¶¶ 50, 60-61, 74.) Moreover, General Manager Watson and Operations Manager Van Bogart knew Supervisor Hernandez's conduct and Senior Manager Joiner's conduct was intentional and recklessly disregarded Plaintiffs' rights, but they did not take corrective action or steps to stop the harassing conduct of Supervisor Hernandez or Senior Manager Joiner. (*Id.* ¶ 57.)

The proposed amended complaint adequately alleges that WFS had knowledge of harassment and other discrimination occurring at the Eagan warehouse, but took no action until the employees became so fed up with the conduct that they walked out in protest on December 13, 2021. In other words, the proposed amended complaint adequately asserts that the hostile work environment to which Plaintiffs were exposed created a high probability of injury to their rights, that WFS plausibly had knowledge of that risk, and that by doing nothing, WFS showed deliberate disregard for the rights of Plaintiffs to be free from harassment and discrimination based on their religion.

Indeed, on the same day as the December 13 protest, Supervisor Hernandez's harassment continued when he yelled from across the warehouse, "this is fucking bullshit" in reference to Muslims praying that day; a statement which Plaintiffs heard. (*Id.* ¶¶ 60-61.) Plaintiffs reported Supervisor Hernandez's actions to Operations Manager Van Bogart, but the situation did not improve. (*Id.* ¶ 63.) Soon after, Supervisor Hernandez went to speak to General Manager Watson and Operations Manager Van Bogart. (*Id.* ¶ 64.) The three of them, in plain sight, mocked the Muslim employees, pointing at them and laughing. (*Id.*)

Due to this continued harassment, several Muslim employees, including Plaintiffs, to walk out and protest in front of the WFS warehouse on December 13, 2021. (*Id.* ¶ 67.) Upset at the protesters, General Manager Watson stated that WFS needed to stop hiring Muslims. (*Id.* ¶ 69.)

It was not until after the December 13 protest that WFS directed Regional HR Manager West to conduct an investigation related to the complaints raised by Plaintiffs and other Muslim and Somali employees in the Eagan warehouse. (*Id.* ¶ 74.) WFS argues,

> The Proposed FAC ¶ 102 concedes: "All of the above conduct by the various WFS supervisors and management, *other than Jennifer West* and Amanda Schwartz, was intentional . . . and done with deliberate disregard for Plaintiffs' rights." That is a well-pleaded factual concession the Court must accept as true, and it removes the key personnel responsible for post-acquisition employment decisions from any allegation of intentional or deliberate-disregard misconduct.

(Dkt. 46 at 9 (citation omitted).)

WFS' argument ignores the well-pleaded allegation that on December 13, 2021, before Regional HR Manager West could begin her investigation regarding Supervisor Hernandez's alleged conduct, Corporate Director Finau and General Manager Watson had termination notices prepared for the twenty-one Muslim employees who walked out, but not for Supervisor Hernandez. (*Id.* ¶ 75.) Moreover, even after Regional HR Manager West concluded her investigation at the end of December 2021 and, based on her assessment that management was acting in a biased and discriminatory way against Somali and Muslim employees at the Eagan warehouse, recommended terminating all

members of the leadership team at the warehouse other than Supervisor Schwartz, WFS allegedly inexplicably terminated only Supervisor Hernandez. (*Id.* ¶¶ 76, 78.)

WFS also argues the proposed amended complaint affirmatively alleges that WFS investigated the complaints and disciplined the supervisor, which WFS characterizes as "the antithesis of conscious or intentional disregard." (Dkt. 46 at 9-10.) The Court is not persuaded by this argument. Plaintiffs allege that WFS *ignored* the recommendation of Regional HR Manager West—specifically tasked to investigate the complaints—to immediately terminate "the entire leadership team at the Eagan facility," except for Supervisor Schwartz, because Regional HR Manager "West concluded that management was acting in a biased and discriminatory way against Somali and Muslim employees at the Eagan warehouse facility and that those employees were being treated unfairly." (Dkt. 43 (Ex. A) ¶ 76.) The decision to terminate a single supervisor rather than follow the recommendation of a WFS HR professional sent to investigate the complaints hardly demonstrates the "antithesis of conscious or intentional disregard." The Court finds that the proposed amended complaint plausibly alleges WFS created a high probability of injury to Plaintiffs' rights, WFS had knowledge of that risk, and that by going against Regional HR Manager West's recommendation, WFS showed deliberate disregard for the rights and safety of Plaintiffs to be free from discrimination and reprisal based on their religion.

WFS cites *Roworth v. Minnesota Mutual Life Insurance Co.*, 674 F.2d 756, 759 (8th Cir. 1982), and *Romano v. ING ReliaStar Life Insurance*, No. 12-CV-0137 SRN/JJK, 2013 WL 3448079, at *18 (D. Minn. July 9, 2013), for the proposition that an imperfect

investigation does not meet the threshold for punitive damages absent malicious, willful, or reckless disregard. (Dkt. 46 at 10.) However, the procedural posture in these cases—involving a determination of evidence on a motion for directed verdict or following the procedure in Minnesota Statutes section 549.191, respectively—is very different from the Rule 15 analysis here. *See Roworth*, 674 F.2d at 757; *Romano*, 2013 WL 3448079, at *18. Moreover, the facts in those cases are inapposite to what occurred at WFS. *Roworth* involved the delivery of the plaintiff's check, which the court found "was delayed because of a good-faith but mistaken belief by [the defendant] as to the manner in which the disability program was to be administered." 674 F.2d at 759. *Romano* involved allegations of a sham investigation that resulted in the plaintiff's termination despite her allegations of workplace assault. *See* 2013 WL 3448079, at *19. In this case, Plaintiffs' allegations do not amount to allegations of a good faith mistake or sham investigation. Plaintiffs allege that WFS ignored the findings and recommendations made by its own investigator (Regional HR Manager West) by not terminating the leadership team at the Eagan warehouse (except for Supervisor Schwartz) even though its investigator found that those individuals had acted in a discriminatory way against Somali and Muslim employees at the Eagan warehouse and also told WFS corporate leadership that she "had never seen a facility ran like this." (Dkt. 43 (Ex. A) ¶¶ 76-78.) WFS cannot argue in good faith that these allegations amount to an assertion of mistake or a concession that there was an innocent explanation for WFS' conduct. Perhaps more

discovery will support WFS' theory, but on a motion to amend under Rule 15, the Court considers the allegations in the proposed amended complaint.[5]

WFS contends that, although Plaintiffs' punitive damages theory is built on the events occurring on May 10 and 11, 2022, the pleading attributes the relevant decisions to Manager Awatt, Senior Operations Manager Ferguson,[6] "and a rotating group of temporary general managers, none of whom Plaintiffs accuse of any discriminatory conduct" prior to these events. (Dkt. 46 at 11-12.) As a starting point, the Court finds that Plaintiffs' punitive damages theory is also based on Supervisor Hernandez's and Senior Manager Joiner's conduct prior to December 13, 2021, given that General Manager Watson and Operations Manager Van Bogart allegedly knew about their conduct and did not take corrective actions or steps to stop that conduct. (Dkt. 43 (Ex. A) ¶ 57.) Further, WFS' argument fails to address the allegation that WFS management ignored the earlier October 19, 2021 complaint regarding Senior Manager Joiner's harassing conduct and that no investigation was forthcoming for almost two months, with harassment continuing into December 2021, leading to the December 13 protest. (*Id.* ¶¶ 50, 60-64, 67, 74.) Moreover, the proposed amended complaint alleges that following the December 13 protest, WFS continuously retaliated and discriminated against

---

5 The Court addresses the deposition testimony of Regional HR Manager West later in this Order.

6 The proposed amended complaint does not mention a "Senior Operations Manager Ferguson" by name, but it is possible that WFS is referring to the "Operations Manager" to whom Karama reported the conduct on October 19, 2021. (*See* Dkt. 43 (Ex. A) ¶ 50; Dkt. 46 at 11.)

Plaintiffs, regardless of their investigation, leading to Plaintiffs' termination. (*Id.* ¶¶ 79-117.)

WFS focuses on deposition testimony that it claims shows that all of the previously offending managers and supervisors had left or otherwise had been otherwise neutralized by May 2022. (Dkt. 46 at 5.) It also highlights Regional HR Manager West's testimony that no temporary WFS replacement manager engaged in conduct that that was discriminatory toward Somali or Muslim employees. (*Id.* at 5-6.) To the extent that a party relies on deposition testimony in a proposed amended complaint, "the Court may review the surrounding portions of that deposition to place that excerpt in context; it need not constrain itself only to the particular, limited excerpt." *Inline Packaging, LLC v. Graphic Packaging Int'l, LLC*, No. 15-cv-3183 (ADM/LIB), 2018 WL 9919941, at *11 (D. Minn. Mar. 8, 2018), *objections overruled*, 351 F. Supp. 3d 1187 (D. Minn. 2018), *aff'd*, 962 F.3d 1015 (8th Cir. 2020). Here, Plaintiffs rely upon deposition testimony for the following allegation: "In the course of this litigation, [Regional HR Manager] West testified that she reported to WFS corporate leadership she 'had never seen a facility ran like this.'"[7] (Dkt. 43 (Ex. A) ¶ 77.) The Court rejects WFS' attempt to expand the Court's review to include Regional HR Manager West's testimony beyond that related to her investigation because such testimony does not place the quoted testimony in context. *See id.*

---

[7] The proposed amended complaint also alleges: "In the course of litigation, Van Bogart, Watson, and Schwartz have testified that FOD walks [sic] all concede that FOD walks were required for Ramp Agents only." (Dkt. 42 ¶ 90.) WFS does not address that deposition testimony in its opposition.

Further, even assuming *arguendo* that the deposition testimony of Regional HR Manager West and others demonstrates that the offending managerial personnel were gone well before any of the complained-of conduct in May 2022, it is plausible that a culture of anti-Muslim sentiment amongst the remaining employees or new supervisors at WTS prevailed between December 2021 and May 2022. Indeed, the proposed amended complaint alleges that Supervisor Abdakadr, who had harassed Plaintiffs by hovering over and spying on Plaintiffs in their prayer area to see if they were really praying, also discriminated against Plaintiffs and other Muslim workers on May 11, 2022 by preventing them from returning to work after the May 10 walkout. (*Id.* ¶¶ 46, 108.) This renders it plausible that discriminatory managerial personnel remained at WFS as of May 2022. WFS also ignores the additional alleged continuing reprisal after Regional HR Manager West concluded her investigation and made her recommendations on December 28, 2021, including the alleged retaliation as to Plaintiffs and other Somali and Muslim employees in paragraphs 80 to 108 of the proposed amended complaint. (*See id.* ¶¶ 76, 80-108.) In sum, Plaintiffs have alleged facts from which a court can reasonably infer that WFS had notice that it had a problem with anti-Muslim bias in October and December 2021 and that unlawful conduct, including retaliation, continued through the end of Plaintiffs' employment in May 2022. The proposed amended complaint plausibly alleges WFS acted with deliberate disregard to the rights of Plaintiffs to be free from discrimination and harassment on the basis of their religion and national origin, and to be

free from reprisal when protesting conduct they alleged violated the MHRA. The Motion to Amend is therefore granted.[8]

## IV. ORDER

Based on the files, records, and proceedings herein, **IT IS ORDERED THAT**:

1. Plaintiffs Leyla Osman and Sayidali Mohamed's Motion for Leave to Amend Complaint to Add Punitive Damage Claims (Dkt. 41) is **GRANTED**;

2. Plaintiffs shall file an Amended Complaint consistent with this Order on **October 20, 2026**, unless an appeal of this Order is sought; and

3. Defendant shall respond to the Amended Complaint in a manner consistent with the Federal Rules of Civil Procedure.

DATED: October 5, 2026

s/Elizabeth Cowan Wright
ELIZABETH COWAN WRIGHT
United States Magistrate Judge

---

[8] The Court notes that WFS does not oppose the proposed amendment to add a reprisal claim under the MHRA. The Motion to Amend is therefore granted as to that claim, as a failure to respond to a motion or argument constitutes a waiver. *See Doll v. Trellis Walnut Towers LLC*, No. 24-cv-136 (ECT/TNL), 2024 WL 4355084, at *3 (D. Minn. Sept. 30, 2024) (collecting cases). With respect to the proposed amendment seeking to add punitive damages to the claim under the Minnesota Payment of Wage Act, WFS asserts only that, "[b]ecause the proposed amendments seek punitive damages on Minnesota state-law causes of action, the substantive requirements for punitive damages contained in Minn. Stat. § 549.20 apply." (Dkt. 46 at 1.) WFS provided no further argument, and the Court concludes that the failure to pay unpaid wages even after a demand to do so plausibly alleges that WFS acted with deliberate disregard to the rights of Plaintiffs and grants leave to amend to add punitive damages to that claim. (*See* Dkt. 43 (Ex. A) ¶¶ 180-90.)